Thias M. **MURPHY**, Appellant,

v.

Otis R. **BOWEN**, Secretary of Health and Human Services, Appellee.

No. 86–1040.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1986.

Decided Jan. 30, 1987.

---

William J. Davis for appellant.

Paul S. Ceja, Asst. Regional Counsel, Office of the Gen. Counsel, Dept. of Health and Human Services (Beverly Dennis, III, Chief Counsel, Region III, Charlotte Hardnett, Supervisory Asst., Regional Counsel, David A. Faber, U.S. Atty., James M. O'Brien, Asst. U.S. Atty., on brief) for appellee.

Before HALL, Circuit Judge, HAYNSWORTH, Senior Circuit Judge, and CLARKE, United States District Judge for the Eastern District of Virginia, sitting by designation.

K.K. HALL, Circuit Judge:

Thias M. Murphy appeals from an order of the district court granting summary judgment on behalf of the Secretary of Health and Human Services in an action challenging the Secretary's denial of social security disability and supplemental security income benefits. The district court held that the Secretary's denial of benefits based upon the determination of an administrative law judge ("ALJ") that Murphy could perform his past relevant work as a grounds keeper was supported by substantial evidence. Because we conclude that the ALJ failed to articulate any justification for his resolution of a clear conflict in the available medical evidence, we reverse and remand for further consideration.

I.

At the time of his hearing before the ALJ, Murphy was forty-two years old. Although records indicate that he has a fourth grade education, it appears that he is functionally illiterate. His most recent work experience was as the head greens keeper at the Tug Valley Country Club in Williamson, West Virginia, where he was employed from January 1, 1978 until April 15, 1983.

Murphy was hospitalized at the Williamson Appalachian Regional Hospital from April 2, 1983, until April 30, 1983, with complaints stemming from a hemorrhoid condition. During his period of hospitalization, he underwent corrective surgery without apparent complications. The final diagnosis of his condition was prolapsed bleeding thrombosed internal and external hemorrhoids.

On September 26, 1983, Murphy applied for disability insurance benefits and supplemental security income benefits pursuant to Title II and Title XVI of the Social Security Act, alleging that he was disabled due to hemorrhoids and a "lack of education." The applications were denied initially and on reconsideration by the Office of Disability Operation of the Social Security Administration, acting upon the recommendation of the West Virginia State Agency. The claims were then subsequently considered *de novo* by an ALJ before whom Murphy personally appeared represented by counsel.

At the administrative hearing, Murphy testified that despite his surgery, the hemorrhoid condition continued to cause him pain. He also testified that he experienced dizzy spells daily which lasted from two to three hours and that his ability to exert himself was limited by shortness of breath.

Medical evidence was presented to the ALJ which included records of Murphy's hospitalization and the results of an arterial blood gas study performed on December 29, 1983.[1] The most significant medical evidence with regard to this appeal, however, involved two conflicting psychological evaluations of Murphy performed on October 15, 1983, and April 19, 1984.

The first evaluation was conducted by Thomas E. Andrews, Ph.D., a clinical psychologist. In connection with his study, Doctor Andrews administered three tests: the Wechsler Adult Intelligence Scale ("WAIS"), the Bender-Gestalt, and the Minnesota Multiphasic Personality Inventory ("MMPI"). Doctor Andrews administered the MMPI orally because Murphy was unable to read the test form. In his report, Doctor Andrews stated that Murphy's intelligence quotient ("I.Q.") scores based on the WAIS results were Verbal–71, Performance–75, and Full Scale–71.[2] He concluded that although Murphy was "somewhat dull," he was not suffering from any kind of psychotic, neurotic or personality disorder. Andrews further opined that because Murphy suffered only from mild retardation with no sign of psychological impairment, he could carry out routine and repetitive tasks in a mildly competitive work environment on a sustained basis.

The second psychological assessment considered by the ALJ was performed by Stanley A. Rudin, Ph.D., also a clinical psychologist. In performing his evaluation, Doctor Rudin employed a methodology that differed from the approach adopted by Doctor Andrews. In assessing Murphy's I.Q., Rudin used the Revised Wechsler Adult Intelligence Scale test ("WAIS–R"). Rudin reported I.Q. scores on the WAIS–R as Verbal–62, Performance–70, and Full Scale–63. Additionally, Rudin administered a Rorschack test rather than the MMPI. The Rorschack was interpreted as indicating psychotic tendencies, lack of contact with reality, and a strong suggestion of schizophrenia or schizoid personality disorder. In his final evaluation, Doctor Rudin concluded that Murphy was "just plain stupid and incompetent in the matter of

---

1. This study, if accepted, indicates that Murphy also suffers from a pulmonary impairment that is significant, although not independently disabling. The ALJ concluded that the study was entitled to little weight because it was both unsigned and uninterpreted by a reviewing physician.

We note that on appeal, however, the Secretary does not dispute either the fact that the test was performed or its essential accuracy.

2. When an I.Q. test is administered in connection with a claim of disability predicated upon an assertion of mental retardation, social security regulations require that the lowest of the Verbal, Performance or Full Scale scores be used in evaluating the claim.

making a living on his own." Rudin further opined that Murphy suffered from "chronic brain syndrome, mental retardation and a marked schizoid personality disorder."

In addition to making his own findings, Doctor Rudin's report expressly criticized the methodology employed by Doctor Andrews. Rudin maintained that the I.Q. results obtained from the newer WAIS–R test were more reliable than those revealed by the WAIS used by Doctor Andrews. Rudin further contended that the MMPI test, which Doctor Andrews administered orally, was only 65% effective when used in that manner. He suggested that if the MMPI were to be used at all on a subject unable to read, more reliable results could be achieved by presenting the test on audio tape cassettes.

Finally, the ALJ considered the testimony of Phyllis Shapiro, a vocational expert. Ms. Shapiro testified that an individual of Murphy's age, education, training, and work experience, suffering from a status post-hemorrhoidectomy with some chronic brain syndrome and with an I.Q. score no lower than 71, could perform work as a grounds keeper or gardener in the "light" job category. In response to a hypothetical question posed by Murphy's counsel, which assumed an individual with the same characteristics that formed the basis of her initial opinion but who also suffered from a respiratory problem, dizzy spells and a full scale I.Q. of 63, Ms. Shapiro opined that such a person could do no work.

After weighing the available evidence, the ALJ concluded that Murphy did not suffer from any impairment or combination of impairments listed at 20 C.F.R., Part 404, Subpart P, Appendix 1, which would entitle him to an automatic finding of disability. The ALJ further determined that despite the fact that Murphy possessed a severe impairment arising from his mental retardation, he retained the residual functional capacity to perform his past relevant work as a grounds keeper. The ALJ, therefore, denied Murphy's claim for benefits. The Appeals Council denied review on September 6, 1984, thus making the Secretary's decision final on that date.

Murphy subsequently filed a civil action in district court seeking review of the Secretary's decision pursuant to 42 U.S.C. § 405(g). In response to cross motions for summary judgment, the court noted that while the evidence in this matter was conflicting, *Thomas v. Celebreeze*, 331 F.2d 541 (4th Cir.1964), placed the resolution of evidentiary conflicts within the province of the Secretary. The district court concluded that the substantial evidence supported the Secretary's findings with regard to Murphy's impairments and his residual functional capacity. Accordingly, the court affirmed the denial of benefits.

This appeal followed.

## II.

On appeal, Murphy contends that the ALJ erred by failing to recognize that medical evidence established the presence of two disabling mental impairments as listed in 20 C.F.R. Subpart P, Appendix 1. Specifically, he argues that Doctor Rudin's report demonstrated the existence of section 12.02 chronic brain syndrome and section 12.05(C) mental retardation.[3] In an

3. The listings applicable to Murphy's claim state in pertinent part:

12.02 Chronic brain syndromes (organic brain syndromes). With both A and B
A. Demonstrated deterioration in intellectual functioning, manifested by persistence of one or more of the following clinical signs:
1. Marked memory defect for recent events; or
2. Impoverished, slowed, perseverative thinking, with confusion or disorientation; or
3. Labile, shallow, or coarse affect;

B. Resulting persistence of marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people.
12.05 Mental retardation. As manifested by:
C. IQ of 60 to 69 inclusive (see 12.00B4) and a physical or other mental impairment imposing additional and significant work-related limitation of function.
Section 12.02 was substantially revised on August 28, 1985. Murphy does not dispute, how-

apparent effort to avoid the reach of *Thomas v. Celebreeze*, Murphy argues that the medical evaluations of Doctors Andrews and Rudin may have differed but did not conflict. In essence, Murphy suggests that Doctor Rudin's examination uncovered impairments undetected by Doctor Andrews and that in rejecting Rudin's evaluation, the ALJ impermissibly substituted his own judgment in place of medical evidence.

As a threshold matter, we find appellant's principal argument strained. There can be no doubt that a clear conflict exists in the medical evidence. Doctor Andrews opined that Murphy had no psychological or personality disorders. He also reported I.Q. results no lower than 71. In sharp contrast, Doctor Rudin reported chronic brain syndrome, a schizoid personality disorder, and I.Q. results as low as 63. It is apparent, therefore, that the ALJ did not simply substitute his own evaluation in place of medical evidence but instead, denied benefits by relying on Doctor Andrews' findings rather than Doctor Rudin's.

Our conclusion that the ALJ based his decision on one of two conflicting pieces of evidence does not, however, end the inquiry in this case. While the Secretary is empowered under *Thomas v. Celebreeze* to resolve evidentiary conflicts, the Secretary, through the ALJ, is required to explicitly indicate "the weight given to all relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir.1984). On the available record we can find little or no indication why the ALJ credited Doctor Andrews' views over those of Doctor Rudin.

The ALJ's failure to articulate the reasons underlying his actions is especially troubling with regard to Murphy's asser-

tion of section 12.05(C) disability. Pursuant to that listing, a claimant who demonstrates an I.Q. between 60 and 69 and who has an additional significant work-related limitation is entitled to a finding of disability. By accepting without explanation, Doctor Andrews' I.Q. results, the ALJ foreclosed any claim based on that listing. As we have indicated, however, Doctor Rudin did more than simply reach a different result. He expressly challenged the testing techniques used in the earlier examination and contended that the evaluation was based in part upon outdated testing materials.[4] In the face of such a sharp division in medical evidence, it is simply unacceptable for the ALJ to adopt one diagnosis over another without addressing the underlying conflict.

We do not, of course, hold that Murphy has established that he has an I.Q. of 63. On remand, the ALJ may find that there are sound reasons not apparent on the present record for continuing to favor Doctor Andrews' position. Nor do we conclude that Murphy has met the second section 12.05(C) requirement of suffering from an additional significant limitation. If on remand, however, the ALJ determines that Doctor Rudin's I.Q. results should be credited, then Murphy has asserted certain ailments, notably a respiratory ailment and a continuing hemorrhoid condition, that must be weighed against the section 12.05(C) standard.[5]

During the course of this appeal, the Secretary has suggested that even assuming that Murphy's I.Q. is within the 60 to 69 range, disability cannot be predicated upon section 12.05(C) because none of his other ailments are significant limitations. Since the ALJ has yet to reach this ques-

---

ever, the Secretary's assertion that his disability claims must be assessed according to the regulations in effect at the time a final decision was rendered. Section 12.05 remains unchanged.

**4.** At oral argument, counsel for the Secretary conceded that Dr. Rudin's criticism had some validity. In response to questions posed by the court, counsel acknowledged that the WAIS–R test is more reliable in lower ranges than the

WAIS. Counsel also admitted that there is evidence that the MMPI results are of limited accuracy.

**5.** It is evident from the record that the ALJ did not determine whether any of Murphy's additional ailments would qualify as a "significant work related limitation of function" under section 12.05(C).

tion, we need not conclusively decide it now. We note, however, that much of the Secretary's argument on this issue appears to focus not upon whether additional limitations exist but upon whether any of Murphy's non-mental impairments are independently disabling. There is, of course, no requirement that the additional section 12.-05(C) limitation be disabling itself.[6] Should the Secretary continue to rely upon this contention on remand, we trust that it will be given no weight.

Finally, we disapprove of the Secretary's efforts to support the denial of benefits based upon this Court's reasoning in *Cauthen v. Finch,* 426 F.2d 891 (4th Cir.1970). We recognized in *Cauthen* that evidence showing that a claimant has worked despite a long standing impairment may be substantial evidence that the impairment is not disabling. It was never alleged in *Cauthen,* however, that the impairment at issue met or equalled the disability listings in Subpart P, Appendix 1. When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap. The relevance of *Cauthen* to a section 12.05(C) mental retardation claim is, therefore, highly questionable.

Although appellate review of the Secretary's decisions regarding the award of benefits is deferential, this Court must be certain that the ultimate decision is supported by substantial evidence. We are unable to make that determination when the ALJ, as occurred here, leaves unresolved conflicts in the evidence. We are unpersuaded by the Secretary's suggestion that the ALJ's failure in this instance can be treated as harmless error.

Accordingly, we remand this case to the district court with directions that it be further remanded for further administrative proceedings consistent with this opinion.

### REVERSED AND REMANDED

**6.** In *Branham v. Heckler,* 775 F.2d 1271, 1273 (4th Cir.1985), we expressly stated that requiring a plaintiff's additional impairment to be independently disabling would render section 12.05(C) meaningless.